681 A.2d 1190

**James Desmond JONES**

v.

**STATE of Maryland.**

**No. 2039, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Sept. 3, 1996.

---

David M. Williams, Chestertown, for appellant.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Susanne Hayman, State's Atty. for Kent County, Chestertown, on brief), for appellee.

Submitted before FISCHER, DAVIS and HARRELL, JJ.

DAVIS, Judge.

On this appeal, appellant James Desmond Jones presents two questions for our review, which we restate as follows:

I.  Did the circuit court err in denying appellant's motion to suppress?

II. Did the circuit court err in refusing to set aside appellant's guilty verdicts and dismiss the criminal charges against him under double jeopardy principles?

We respond to these questions in the negative and, therefore, affirm the circuit court's rulings.

## FACTS

On May 3, 1995, the State of Maryland filed a criminal information in the Circuit Court for Kent County (Price, J.) charging appellant with possession of cocaine and possession of cocaine with intent to distribute. On the same day, pursuant to MD.ANN.CODE art. 27, § 297, Kent County filed a complaint in the circuit court seeking to obtain the forfeiture of appellant's 1979 Chevrolet Truck and $330 in cash recovered from appellant at the time of his arrest. The forfeiture complaint alleges that the truck was used to transport or facilitate the transportation, sale, and possession of controlled dangerous substances, *see* MD.ANN.CODE art. 27, § 297(b)(4), and that the cash was used in connection with the illegal distribution or possession of controlled dangerous substances, *see* MD.ANN.CODE art. 27, § 297(b)(6). The prosecutor in *State of Maryland v. James Desmond Jones* also prosecuted the forfeiture complaint.

Appellant filed a motion to suppress the evidence, arguing that the police allegedly obtained evidence in violation of appellant's rights under the Fourth Amendment of the U.S. Constitution and under the Maryland Constitution. Appellant also filed a motion seeking to consolidate the suppression hearing with the forfeiture hearing. The motion to consolidate was granted.

The consolidated hearing was held on July 6, 1995. Four witnesses testified: Sergeant Vernon J. Conaway of the Maryland State Police, assigned as supervisor of the Kent County Drug Task Force (Task Force); Sergeant Timothy S. Knapp of the Task Force; Trooper First Class Harry L. McDaniel of the Task Force; and Detective Robert A. Walters of the Kent County Sheriff's Office, assigned to the Task Force. We summarize the testimony of these witnesses as follows.

Sergeant Conaway, a veteran drug enforcement officer, testified that, on Thursday night of March 30, 1995, he conducted a surveillance at the Village Tavern Bar (Tavern) in Chestertown, Maryland. The purpose of the surveillance was to observe appellant—a suspect about whom complaints and

information had been received alleging that appellant was a cocaine dealer and that he dealt cocaine from the Tavern primarily on Thursdays, Fridays, and on some Saturdays. This information came from both citizen complaints and from a confidential informant. According to Sergeant Conaway, the confidential informant's information was reliable, it having led in the past to arrests of other individuals for drug law violations and to seizures of drugs and narcotics. The confidential informant never in the past gave false or misleading information to the Task Force. According to Sergeant Knapp (another veteran drug enforcement officer), during the preceding four or five years the police had received complaints regarding appellant's drug involvement. Indeed, Sergeant Knapp acknowledged that a search warrant of appellant's home was executed two years before the Tavern surveillance, but nothing incriminating was recovered.

During the surveillance, Sergeant Conaway and Sergeant Knapp were stationed in a vacant third floor apartment of a nearby building, looking down at the Tavern. Sergeant Conaway was looking out of a bedroom window and Sergeant Knapp was on the balcony. According to Sergeant Conaway, they were positioned approximately 300 feet away from the Tavern. Sergeant Knapp, however, stated that they were about twenty-five or thirty yards away. The lights were out in the apartment. In addition to binoculars, they employed a night vision telescope. Detective Walters and Trooper McDaniel were in a covert vehicle parked down the street from the Tavern.

At approximately 10:00 p.m., appellant drove his pick-up truck into the back parking lot of the Tavern, which is illuminated by lights on the back of the building. After parking, appellant walked into the Tavern. At approximately 10:30 p.m., appellant came out of the Tavern and walked toward his truck. As he was walking, appellant was counting paper currency that he was holding in his hand. Appellant entered his truck from the driver's side, sat down, and flipped the truck's sun visor down. After doing so, appellant was

observed looking down into his lap and then putting the sun visor up. Appellant exited the truck and began walking.

He was met by a second man. Sergeant Knapp recognized the man as an individual about whom "well over 100 calls" have been received indicating that he was a cocaine addict. Sergeant Conaway testified that he observed appellant hand the man—in a "nonchalant exchange, which is customary in the drug culture"—an item concealed in appellant's hand. Sergeant Conaway could not actually see what that object was. Although the police did not apprehend the second man to confirm that he had received drugs from appellant, Sergeant Conaway believed from his training and observations that a drug transaction just transpired between appellant and the man. Similarly, Sergeant Knapp testified, "There is no question in my mind what I saw was a drug transaction."

Thereafter, Sergeant Conaway and Sergeant Knapp met in the living room of the apartment and acknowledged having witnessed a drug deal. According to Sergeant Knapp, "at that time, we called for TFC McDaniel and for Detective Walters to come to ... that location so we could take down the [appellant]." Sergeant Knapp explained that this was when the decision was made to place appellant under arrest.

Sergeant Conaway and Sergeant Knapp then left the apartment and entered the Tavern. Approximately ten minutes had elapsed since the officers observed the transaction. They approached appellant and asked him to step outside of the crowded bar. Sergeant Conaway explained that he held one of appellant's arms as appellant was escorted out of the Tavern. The officers informed appellant of their observations and told him to place his hands on the concrete wall of the Tavern located outside of the doorway. Sergeant Conaway searched appellant and recovered $330 in cash and the keys to the truck.

Sergeant Conaway handed the keys to Sergeant Knapp. By this time, Detective Walters and Trooper McDaniel had arrived on the scene. Holding appellant's arms, Sergeant Conaway and Trooper McDaniel escorted appellant approxi-

mately 120 to 130 feet to his truck, with Sergeant Knapp and Detective Walters leading the way. Sergeant Conaway testified that he and Trooper McDaniel had held appellant to prevent appellant—who "wasn't free to leave"—from fleeing their control and custody. According to Sergeant Knapp, appellant was in handcuffs during the walk to the truck. Sergeant Knapp also stated that on an occasion in the past, a drug suspect had eluded and fled from him in the Tavern parking lot.

Sergeant Knapp proceeded to search appellant's truck. He began searching under the seat and behind the back seat of the truck, at which time Sergeant Conaway instructed Sergeant Knapp to flip down the sun visor. After doing so, Sergeant Knapp recovered seven small plastic bags of cocaine. Sergeant Knapp explained that, from his observations and from the fact that "there would be no reason for the [appellant] to go to the vehicle prior to the drug transaction which occurred behind the Village Tavern," his belief before searching the truck was that it contained drugs.

At some point, Sergeant Knapp directed Detective Walters to take the truck to the Sheriff's Office to finish the search because a small crowd started to gather in the parking lot and Sergeant Knapp believed it would be safer to move the truck. From Detective Walter's further search, a document that appellant allegedly used to keep a record of his drug debts was recovered.

Sergeant Knapp then approached appellant and advised him that he was under arrest for possession of cocaine with intent to distribute. *Miranda* warnings were read to appellant at that time. Sometime thereafter, appellant is alleged to have voluntarily made incriminating statements.

At the close of the consolidated hearing, after making factual findings matching the facts presented above, the circuit court denied the motion to suppress. Just as the circuit court was preparing to rule on the forfeiture complaint, the prosecutor—apparently anticipating that the circuit court was going to order the forfeiture of appellant's property and recognizing

a potential double jeopardy problem—interjected and request-ed the circuit court not to order the forfeiture until after the prosecutor had submitted an order of forfeiture to the circuit court following the final decision in the criminal case. In this regard, the prosecutor stated, "If I was going to lose one on double jeopardy, I would opt to lose the forfeiture over the criminal case." Over the objection of defense counsel, the circuit court granted the prosecutor's request and reserved judgment on the forfeiture issues.

On October 13, 1995, a bench trial was conducted on appel-lant's criminal charges. At the conclusion of the State's case, the circuit court denied appellant's motion for acquittal. After notifying the circuit court that the defense would not call any witnesses and that appellant would not testify, appellant re-newed his motion for acquittal, after which counsel presented closing arguments. The circuit court, thereupon, found appel-lant guilty of both charges beyond a reasonable doubt.

On November 6, 1995, appellant filed a Motion for Court Decision requesting the circuit court to render a decision with respect to the forfeiture complaint. In this motion, appellant argued that the purpose of the prosecutor's request for a reservation of judgment in the forfeiture matter was to pre-vent appellant from filing a motion to dismiss the criminal proceedings on double jeopardy grounds. The prosecutor responded that the disposition of the forfeiture matter should occur on November 29, 1995 at 9:00 a.m.—the date and time that appellant was scheduled to be sentenced. On November 7, 1995, appellant filed a motion, pursuant to MARYLAND RULE 4–331(b), requesting the circuit court to set aside the guilty verdict and dismiss the charges on double jeopardy grounds.

At the November 29, 1995 hearing, the circuit court denied appellant's Rule 4–331(b) motion. In so doing, the circuit court determined that appellant was not placed twice in jeop-ardy in violation of the U.S. Constitution or the Maryland Constitution. In addition, the circuit court determined that the truck was used to transport controlled dangerous sub-stances. Accordingly, the circuit court ordered the forfeiture

of the truck. The circuit court also ordered the forfeiture of the $330.[1] Finally, the circuit court sentenced appellant to ten years in prison (seven years suspended). Although the circuit court stated that it typically would have imposed a fine in such a case, it refused to do so in view of the forfeiture order.

After a series of unsuccessful post-sentencing motions seeking to set aside the guilty verdict and sentence, appellant noted an appeal to this Court. Other facts shall be presented during our disposition of the legal questions with which those facts pertain.

## DISCUSSION

### I

Appellant first argues that the circuit court erred in denying the motion to suppress. In this regard, appellant essentially contends that the warrantless search of the truck was illegal and that the warrantless arrest of appellant was illegal. We disagree.[2]

█ The arrest of appellant was a lawful warrantless arrest. An arrest of an individual is valid when a police officer has probable cause to believe that the individual has committed a felony or misdemeanor in the officer's presence or view. MD.ANN.CODE art. 27, § 594B(b) (1992). In *Collins v. State,*

---

1. In granting the forfeiture, the circuit court requested the prosecutor to prepare an order reflecting the forfeiture ruling. The docket entry in the forfeiture proceeding reads: "Court order truck and currency forfeited to Kent County. Mr. Yeager [the prosecutor] to prepare Order." The record on this appeal does not indicate whether such an order was ever submitted to and signed by the trial court. The aforementioned docket entry is the last docket entry on the copy of the "Civil Action Docket" in the forfeiture proceeding, which was filed in the criminal proceeding and which is a part of the record on this appeal.

2. The State argues that certain aspects of appellant's argument were not raised below, and are, therefore, not preserved for appeal. Because we reject appellant's argument entirely, it is unnecessary to determine whether the State is correct in this regard.

322 Md. 675, 680, 589 A.2d 479 (1991), the Court of Appeals explained the nature of probable cause:

> Probable cause, we have frequently stated, is a nontechnical conception of a reasonable ground for belief of guilt. A finding of probable cause requires less evidence than is necessary to sustain a conviction, but more evidence than would merely arouse suspicion. Our determination of whether probable cause exists requires a nontechnical, common sense evaluation of the totality of the circumstances in a given situation in light of the facts found to be credible by the trial judge. Probable cause exists where the facts and circumstances taken as a whole would lead a reasonably cautious person to believe that a felony had been or is being committed by the person arrested. Therefore, to justify a warrantless arrest the police must point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted the intrusion.

(Citations omitted).

█ The Supreme Court of the United States, in *Ornelas v. United States,* —— U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), very recently addressed the issue of the appropriate standard by which appellate courts should review the decision of the suppression hearing judge. In *Ornelas,* the Supreme Court disagreed with the United States Court of Appeals for the Seventh Circuit, which determined that findings of reasonable suspicion to stop and probable cause to search should be reviewed deferentially and for clear error. *Id.* Rather, the Supreme Court determined that these ultimate questions are to be reviewed *de novo* on appeal. *Id.* at ——, ——–——, 116 S.Ct. at 1659, 1661–64.

> Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.

*Id.* at ——–——, 116 S.Ct. at 1663–64. Specifically, an appellate court shall give due weight to a trial court's determi-

nation that the officer was credible and the inference was reasonable. *Id.*

*Ornelas* modifies this State's existing law in a very subtle, yet important, manner. In *State v. Blackman,* 94 Md.App. 284, 617 A.2d 619 (1992), this Court thoroughly explained how Maryland appellate courts review determinations of suppression hearing judges. According to *Blackman,* an appellate court shall extend great deference to the suppression hearing judge's findings of first-level facts and assessments of credibility, unless those determinations are clearly erroneous as a matter of law. *Id.* at 293, 617 A.2d 619. In this regard, *Blackman* and *Ornelas* are in synchronization.

*Blackman* further explained that once these first-level findings and credibility determinations are made, a reviewing court does not second-guess the initial decision of the police officer that then became the object of judicial scrutiny. *Id.* Rather, according to *Blackman,* when reviewing an officer's "on the street" determination of probable cause, an appellate court's task is to decide whether the officer had a substantial basis for concluding that probable cause existed. *Id.* at 293, 298, 617 A.2d 619. It is in this regard that *Blackman* and *Ornelas* part ways. *Ornelas,* as we explained, holds that a reviewing court does not extend this sort of deference to the officer, but must make its own *de novo* determination of whether probable cause existed in light of the not clearly erroneous first-level findings of fact and assessments of credibility.

■ Applying the principles of *Ornelas* to the instant case, we conclude the following. The circuit court obviously found the police officers' testimony during the consolidated hearing to be credible given that the circuit court's recital of its findings of fact matched the testimony of the officers. As a result, we shall give great deference to the first-level facts as testified to by the officers. Armed with these facts, our task then is to determine, *de novo,* whether probable cause to arrest appellant existed. We are convinced that it did.

■ In view of the circumstances and events leading up to the point at which appellant was placed under arrest, we have no question whatsoever that probable cause existed to believe that appellant had committed a crime in the parking lot of the Tavern.[3] Without repeating the entire testimony, the confluence of several facts compels a finding of probable cause: the reliable confidential informant's information indicating that appellant dealt cocaine out of the Tavern on Thursdays, Fridays, and Saturdays; appellant's conduct in counting currency on his way to the truck; his apparent retrieval of something from the visor of his truck; and his covert exchange of a small item with a known cocaine user in a secluded area. In addition, the surveying officers were veteran drug enforcement officers who had determined that, based on their experience, the exchange was consistent with a drug deal. Consequently, the arrest of appellant was lawful.

■ The search of appellee's pick-up truck was also lawful. "[G]iven probable cause to believe that an automobile is transporting contraband, a warrantless search of an automobile is not unreasonable within the meaning of the Fourth Amendment." *State v. James*, 87 Md.App. 39, 45–46, 589 A.2d 81 (1991) (citing *Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 283–84, 69 L.Ed. 543 (1925)). The "automobile exception" to the warrant requirement is recognized because exigent circumstances exist from the fact that cars can be moved quickly. *Id.* at 46, 589 A.2d 81. Additionally, the

---

**3.** Although it was not until after the drugs were found in the truck that the police specifically informed appellant that he was under arrest and read the Miranda warnings to him, we have no doubt that appellant was actually arrested when he was taken out of the Tavern, searched, and physically escorted back to his truck. Appellant was physically restrained by the police, he submitted to this physical restraint, and, as the testimony indicated, the police decided to take appellant into custody after witnessing the transaction. *See Barnhard v. State*, 325 Md. 602, 611, 602 A.2d 701 (1992) (in general, an arrest is the detention of a suspected offender for the purpose of prosecuting him for a crime and occurs when, *inter alia*, the arrestee is physically restrained by an act indicating an intention to take him into custody and subjecting him to the actual control and will of the person effecting the arrest).

expectation of privacy associated with a car is less than that associated with a home or office. *Id.*

In the instant case, there can be no doubt that the police had probable cause to believe that drugs were in the truck. They watched as appellant exited the Tavern counting money, entered his truck and pulled down the visor, and then met with a known drug user to exchange a small object. As we explained above, the police had probable cause to believe that a drug deal had just occurred. Moreover, they had probable cause to believe that the truck was the source of the drugs in view of the foregoing facts and in light of the reasonable inference that if drugs were not in the truck, appellant would not have made a detour to his truck and pulled down the visor before making the covert exchange.

Of course, the fact that an automobile is the subject of the police search does not mean that the Fourth Amendment is ignored. In this regard, we held in *Humphrey v. State,* 39 Md.App. 484, 493–94, 386 A.2d 1238, *cert. denied,* 283 Md. 733 (1978), as follows:

> At the time of the search, appellant was under arrest and was being held at the police station. The search was conducted during the middle of the night at a time when the truck was parked in a placid environment in front of appellant's house. The State failed to proffer any evidence that either appellant's employer (the owner of the truck), appellant's accomplices in the crime, or his wife in any way evidenced a potential to remove the truck before the police could obtain a search warrant. In this factual posture we are persuaded that the reasoning employed by Justice Stewart in *Coolidge v. New Hampshire,* 403 U.S. 443 [91 S.Ct. 2022, 29 L.Ed.2d 564] (1971) is also appropriate to the case *sub judice.* At pages 461–62, he said:
>
>> "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears. And surely there is nothing in this case to invoke the meaning and purpose of the rule of *Carroll v. United States*—no alerted criminal bent on flight, no fleeting

opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile. In short, by no possible stretch of the legal imagination can this be made into a case where 'it is not practicable to secure a warrant', *Carroll, supra,* at 153 [45 S.Ct. at 285], and the 'automobile exception,' despite its label, is simply irrelevant."

\*   \*   \*   \*   \*   \*

Under circumstances such as these when there is no apparent risk that a delay in the search would raise the possibility of destruction or removal of the evidence, it is incumbent that the police first obtain a search warrant, as mandated by the fourth amendment, before a search of the vehicle can be conducted. The individual rights safeguarded by the requirement that a search warrant be issued by a neutral, detached magistrate prior to search far outweigh the inconvenience incurred by having the police guard the vehicle for a short period of time when, as here, such action could have prevented its removal.

Appellant argues that the facts of the instant case are like those of *Coolidge* (and, inferentially, like those of *Humphrey* ). In this regard, appellant asserts that the police had ample opportunity to secure a search warrant for the truck. Appellant observes that he was in police custody, the locked truck was in police control, and there were four officers at the scene safeguarding the vehicle. Appellant further asserts that, as in *Coolidge,* the officers arguably possessed probable cause for the search of the truck for weeks prior to March 30, 1995. He also points out that the truck was not an unexpected discovery at the scene and that the time within which it took to set up the surveillance demonstrates that there was sufficient time to procure the warrant. According to appellant, therefore, no exigent circumstances existed to justify the warrantless search of the truck. We disagree.

The facts of the instant case are vastly different from those in *Coolidge* and *Humphrey*. As the Court of Appeals recognized in *Mobley v. State*, 270 Md. 76, 88, 310 A.2d 803 (1973), the vehicle in *Coolidge* was immobilized on a private driveway; the defendant was arrested and his wife was in protective custody; and, most critically, the police had probable cause for weeks to obtain a proper warrant to search the vehicle. In *Humphrey*, the defendant was far from the scene being held at the police station, and the search was conducted in the middle of the night in a "placid environment in front of [the defendant's] house."

In the instant case, the vehicle was parked in the parking lot of a very crowded bar at a time when a crowd was already beginning to gather outside—not in the middle of the night in the "placid environment" of a private driveway. Although appellant was under police control, appellant was still on the scene in the parking lot. While it may not have been too much to ask for the police to stand guard outside of the vehicle located in the placid environment described in *Humphrey*, we refuse to require the police to do the same in the setting of this case. *Cf. Fowler v. State*, 79 Md.App. 517, 526, 558 A.2d 446, *cert. denied*, 317 Md. 392, 564 A.2d 406 (1989) (upholding a warrantless search of a car under circumstances in which—although the defendant was at large—there was no chance of the car being moved because two armed police officers remained with the car and intended to prevent anyone from moving or interfering with the car).

Most significantly, the police did not have probable cause for weeks to search appellant's truck as they did in *Coolidge*. Although the police obtained detailed information regarding where and when appellant conducted his drug transactions, the information did not relate specifically to his truck as being a "treasure trove" for drugs. Indeed, had appellant not made the special trip to his truck and flipped down the sun visor before making the exchange, the police would have lacked probable cause to believe that drugs were in the truck. Thus, probable cause to believe that drugs were in the truck did not

exist weeks before the March 30, 1995 exchange, but sprung into being at the conclusion of the exchange.

In sum, the warrantless search of the truck was lawful and the warrantless arrest of appellant was lawful. The circuit court's denial of appellant's motion to suppress is affirmed.

## II

Appellant lastly argues that his double jeopardy rights were violated because he was subjected to two prosecutions (the criminal action and the forfeiture action) and was punished twice (the prison term and order of forfeiture). As a result of recent and significant Supreme Court developments in this area of constitutional law, we reject appellant's argument.[4] Furthermore, these developments require us to reconsider the correctness of *Stratemeyer v. State*, 107 Md.App. 420, 668 A.2d 948 (1995)—a double jeopardy case concerning civil forfeitures that this Court decided earlier in this term on December 27, 1995.

In *Stratemeyer v. State*, we confronted a defendant's double jeopardy argument that the trial court erred in refusing to dismiss criminal charges pending against him when the trial court had previously ordered a forfeiture under MD.ANN.CODE art. 27, § 297 of non-contraband property. *Id.* at 423, 668 A.2d 948. The defendant was charged with, among other things, having imported, distributed, possessed, and possessed with intent to distribute cocaine. *Id.* at 424, 668 A.2d 948. Shortly after the indictment, the State filed a forfeiture action seeking an order requiring the defendant to forfeit various vehicles that he owned. *Id.* The State alleged that the vehicles were traceable to proceeds of the defendant's drug distributions and that the defendant knew that the vehicles

---

4. The State argues that appellant's contention that he was subjected to multiple punishments is not preserved for appellate review because he waived it below. Because we reject appellant's double jeopardy challenge in its entirety, it is unnecessary to determine whether that particular aspect of appellant's argument was preserved for appeal.

were used to facilitate the transportation, sale, and possession of controlled dangerous substances. *Id.*

At the onset of our opinion, we recognized that the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, protects against three distinct abuses: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *Id.* at 427, 668 A.2d 948. The focus in *Stratemeyer* was on the third protection. *Id.* at 427–28, 668 A.2d 948.

Relying on the analytical framework in *United States v. Ursery*, 59 F.3d 568, 571 (6th Cir.1995), we recognized that three questions must be addressed in determining whether the government has violated the defendant's double jeopardy rights:

(1) Did the civil forfeiture constitute "punishment" for double jeopardy purposes?

(2) Are the civil forfeiture and criminal conviction punishment for the "same offense?" and

(3) Are the civil forfeiture and criminal prosecution "separate proceedings?"

*Stratemeyer*, 107 Md.App. at 429, 668 A.2d 948. An affirmative answer to these three questions results in a double jeopardy violation. *Ursery*, 59 F.3d at 571.

We answered the first *Ursery* question in the affirmative, concluding "that a forfeiture under § 297(b)(4) and (b)(6) constitutes punishment for double jeopardy purposes." *Stratemeyer*, 107 Md.App. at 436, 668 A.2d 948. As we shall explain, we held that three cases—*United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), *Austin v. United States*, 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), and *Aravanis v. Somerset County*, 339 Md. 644, 664 A.2d 888 (1995)—compelled this conclusion.

As we observed in *Stratemeyer*, the Supreme Court in *Halper* recognized that a civil monetary penalty imposed by

the government may constitute punishment for purposes of double jeopardy. *Stratemeyer*, 107 Md.App. at 430–31, 668 A.2d 948. We further observed that *Halper* held that the government could not impose a criminal penalty and then, in an action based on the same conduct, receive a civil judgment that is not rationally related to the goal of compensating the government for its loss. *Id.* at 431–32, 668 A.2d 948. We summarized *Halper*'s holding as follows:

> *Halper*, of course, did not involve a forfeiture statute; it merely set forth the required analytical framework for determining when a sanction ordinarily regarded as civil in nature may constitute punishment for double jeopardy purposes.

*Id.* at 432, 668 A.2d 948.

We further recognized in *Stratemeyer* that the Supreme Court in *Austin* held that a civil forfeiture constitutes payment to a government as punishment for an offense and, therefore, is subject to the limitations of the Eighth Amendment's Excessive Fines Clause. *Id.* at 433–34, 668 A.2d 948. Along the same lines, we observed that the Court of Appeals of Maryland—relying in large part on *Austin*—recently determined in *Aravanis* that a § 297 forfeiture constitutes punishment for purposes of Article 25 of the Maryland Declaration of Rights—Maryland's counterpart to the Excessive Fines clause of the Eighth Amendment.[5] *Id.* at 436, 668 A.2d 948.

After analyzing the holdings in *Halper, Austin,* and *Aravanis*, we held:

---

**5.** "Article 25 is, textually and historically, substantially identical to the Eighth Amendment. Indeed, both of them were taken virtually verbatim from the English Bill of Rights of 1689. Thus, it is well settled in this State that Article 25 of the Maryland Declaration of Rights is *in para materia* with the Eighth Amendment. Indeed, the excessive fines provision of Article 25 was one of eight such provisions which served as a model for the Excessive Fines Clause of the Eighth Amendment. Thus, the excessive fines provision of Article 25 should be interpreted co-extensively with the excessive fines provision of the Eighth Amendment." *Aravanis*, 339 Md. at 656–57, 664 A.2d 888 (citations omitted).

When one puts these two lines of cases together, an inescapable conclusion emerges. *Halper*, as clarified in *Austin*, establishes that, if a civil penalty or sanction has any punitive aspect to it, it constitutes punishment for purposes of the Double Jeopardy Clause of the Fifth Amendment. *Austin* mandates and *Aravanis* ... directly holds that a forfeiture under art. 27, § 297 constitutes punishment for purposes of at least the Maryland counterpart to the Excessive Fines clause of the Eighth Amendment, if not the Federal provision itself.

Upon this reasoning and upon specific pronouncements of the Supreme Court and the Court of Appeals, we reject the State's argument that a forfeiture of non-contraband property under § 297 may constitute punishment under the Eighth Amendment but not under the Double Jeopardy Clause of the Fifth. The most telling fallacy in that argument under the current case law is the fact that the "the Supreme Court used *Halper*'s definition of 'punishment' under the Double Jeopardy Clause to define 'punishment' for purposes of the Eighth Amendment." We hold, therefore, that a forfeiture under § 297(b)(4) and (b)(6) constitutes punishment for double jeopardy purposes and declare that anything to the contrary said in *Allen v. State*, [91 Md.App. 775, 605 A.2d 994 (1992) ], is hereby overruled.[6]

*Id.* at 436–37, 668 A.2d 948 (citations and footnote omitted).

After responding in the affirmative to the first *Ursery* question, we responded in the negative to the second. *Id.* at 437–39, 668 A.2d 948. In *Stratemeyer*, the circuit court ordered forfeiture of certain vehicles solely on the basis that the property was acquired with funds obtained by the defendant

---

**6.** In *Allen*, the defendant argued that, because the civil forfeiture of his property under § 297 constituted punishment for offenses then pending against him, placing him in jeopardy of further criminal sanctions would constitute a violation of the double jeopardy protection against successive prosecutions. *Allen*, 91 Md.App. at 782, 605 A.2d 994. In *Allen*, we ultimately concluded that a forfeiture proceeding is a civil action not involving the Double Jeopardy Clause nor the Maryland double jeopardy prohibition. *Id.* at 788, 605 A.2d 994.

through illicit drug activities. *See* M\ *Md*.A\ *nn*.C\ *ode* art. 27, § 297(b)(10). The defendant purchased these vehicles before September 11, 1992, the date that the defendant was alleged to have possessed cocaine with the intent to distribute. Consequently, the conduct that formed the basis of the forfeiture necessarily was not the same conduct that formed the basis of the current criminal charges. *Stratemeyer,* 107 Md.App. at 438, 668 A.2d 948. Thus, we held that the forfeiture did not constitute a multiple punishment for the same offense. *Id.*

The circuit court in *Stratemeyer,* however, also ordered the forfeiture of a Toyota truck that the defendant purchased in January 1992. The circuit court gave alternative grounds for this forfeiture ruling: the Toyota was purchased with drug money, *see* M\ *d*.A\ *nn*.C\ *ode* art. 27, § 297(b)(10), and the Toyota was used for drug purchasing and distribution, *see* M\ *d*.A\ *nn*. C\ *ode* art. 27, § 297(b)(4). *Id.* As to the first ground, we held that, under the reasoning applied with respect to the other forfeited vehicles mentioned above, the forfeiture was not a multiple punishment for the same offense. *Id.* As to the alternative ground, we stated:

> As we indicated, none of the evidence presented at the forfeiture hearing is in the record before us, so, with respect to the alternate ground relied on by the court, we do not know whether the truck was used to acquire, transport, store, or distribute any of the drugs imported, possessed, or distributed by appellant on September 11, 1992. There was certainly no such finding by the court, either when it ordered the forfeiture or when it denied [the defendant's] motion to dismiss the criminal charges.

*Id.* at 438–39, 668 A.2d 948. Observing that double jeopardy must be raised by the defendant through an appropriate motion and that it is a defendant's duty to establish a sufficient record for the appellate court to decide that issue, we held that "[t]here is nothing in the record to indicate that the Toyota was used in connection with any of the substances or paraphernalia forming the basis of the criminal charges." *Id.* at 439, 668 A.2d 948.

As a result of our disposition of the second *Ursery* question, we concluded that the defendant's double jeopardy rights were not violated because the forfeiture was not a punishment for the "same offense" for which the defendant was being criminally charged.[7] Thus, we concluded "that, while the forfeitures in question constituted punishment, there is no evidence in this record from which we could conclude that they constituted a punishment for the same offense. Accordingly, we do not need to address the third question set forth in [*Ursery* ] of whether the proceedings are the same...." *Id.* We, therefore, affirmed the trial court.

On June 24, 1996, just less than six months after our decision in *Stratemeyer*, the Supreme Court issued its decision in *United States v. Ursery*, —— U.S. ——, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996). In addition to overruling the Sixth Circuit's decision in *United States v. Ursery*, a case upon which we heavily relied in *Stratemeyer*, the Supreme Court arrived at a holding that calls into serious question the correctness of *Stratemeyer*.

In *United States v. Ursery*, the Supreme Court consolidated two cases for review—one from the U.S. Court of Appeals for the Sixth Circuit (*United States v. Ursery*, 59 F.3d 568, (6th Cir.1995)) and the other from the U.S. Court of Appeals for the Ninth Circuit (*United States v. $405,089.23 U.S. Currency*, 33 F.3d 1210 (9th Cir.1994)). In both cases, the federal courts of appeal held that the Double Jeopardy Clause precludes the government from punishing a defendant for a criminal offense and forfeiting his property for that same offense in a separate civil proceeding. *Id.* The Supreme Court reversed those holdings. *Id.*

---

**7.** To determine whether two offenses are the same offense under double jeopardy analysis, we observed that the "required evidence" or common elements test is applied. *Stratemeyer*, 107 Md.App. at 437, 668 A.2d 948. Under this test, a court must determine whether each offense contains an element not found in the other offense. *Id.* If each offense contains an element which the other offense does not, the offenses are not the same under double jeopardy analysis—regardless of whether they arise from the same conduct or episode. *See Monoker v. State*, 321 Md. 214, 582 A.2d 525 (1990).

According to the Supreme Court, "[s]ince the earliest years of this Nation, Congress has authorized the Government to seek parallel *in rem* civil forfeiture actions and criminal prosecutions based upon the same underlying events." *Id.* at ——————, 116 S.Ct. at 2139–41. Moreover, the Supreme Court stated that "in a long line of cases" it has consistently concluded that the Double Jeopardy Clause does not apply to civil forfeitures because such actions do not impose punishments. *Id.* The Supreme Court examined three of its opinions in this long line of cases: *Various Items of Personal Property v. United States,* 282 U.S. 577, 51 S.Ct. 282, 75 L.Ed. 558 (1931), *One Lot Emerald Cut Stones & One Ring v. United States,* 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972) (per curiam), and *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984).

In *Various Items* a distilling company was ordered to forfeit a distillery, warehouse, and denaturing plant on the ground that the company had conducted its business in violation of federal law. *Ursery,* —— U.S. at ——————, 116 S.Ct. at 2139–41. Prior to the forfeiture action, the company was convicted of criminal violations based on transactions which had also served as the basis for the forfeiture. *Id.* Holding that an *in rem* forfeiture is not punitive, the Supreme Court in *Various Items* unanimously rejected the company's argument that the forfeiture action violated the Double Jeopardy Clause. *Id.* According to *Ursery,* had *Various Items* found that a civil forfeiture could constitute punishment under the Double Jeopardy Clause, it would have been "quite remarkable" because "at common law, not only was it the case that a criminal conviction did not *bar* a civil forfeiture, but, in fact, the civil forfeiture could not be *instituted* unless a criminal conviction had already been obtained." *Id.* at ——, 116 S.Ct. at 2141. *See also Bozman v. Office of Finance of Baltimore County,* 52 Md.App. 1, 6, 445 A.2d 1073 (1982) ("At English common law, the prerequisite to forfeiture was a conviction."), *aff'd,* 296 Md. 492, 463 A.2d 832 (1983).

Next, *Ursery* examined *Emerald Cut Stones,* wherein an owner of jewels—after having been acquitted of smuggling the jewels into the U.S.—intervened in the government's action seeking the forfeiture of the jewels as contraband. *Ursery,* —— U.S. at —— – ——, 116 S.Ct. at 2141–43. In rejecting the owner's double jeopardy challenge to the forfeiture, the Court in *Emerald Cut Stones* held that neither two criminal trials nor two criminal punishments were involved. *Id.* According to the Court, the forfeiture of the jewels was a civil sanction— not a punishment—because the forfeiture did not impose a second *in personam* penalty for the owner's wrongdoing. *Id.*

*89 Firearms* was the final case that *Ursery* examined in the long line of Supreme Court cases holding that the Double Jeopardy Clause does not apply to civil forfeitures. In *89 Firearms,* a weapons owner was acquitted of charges of dealing firearms without a license before the government brought a forfeiture action against the firearms. *Id.* The Supreme Court unanimously held that the forfeiture was not barred by the prior criminal proceeding. *Id. 89 Firearms* employed a two-part analysis in reaching this holding: whether Congress intended the forfeiture to be a remedial civil sanction, and whether the statutory scheme was so punitive in purpose or effect so as to negate Congress's intent to create a civil remedial mechanism. *Id.*

In answering the first part of the analysis in the affirmative, the Supreme Court in *89 Firearms* noted that the forfeiture proceeding was *in rem*—a type of proceeding traditionally viewed as civil. *Id.* The Supreme Court also observed that the forfeiture provision reached a broader range of conduct than the criminal provision because the forfeiture provision covered weapons used in violation of federal law and those intended to be used in violation of federal law. *Id.* Furthermore, the Supreme Court concluded that the forfeiture provision served broad remedial goals such as discouraging unregulated firearms trade and removing firearms from commerce that have been used or intended for use outside of regulated trade channels. *Id.*

In answering part two of the analysis in the negative, the Supreme Court considered several factors. The fact that the conduct proscribed by the forfeiture provision was already a crime was the only factor present tending to indicate that the "civil proceeding was so punitive as to require application of the full panoply of constitutional protections required in a criminal trial." *Id.* By itself, however, this factor was insufficient to turn the forfeiture into a punishment within the contemplation of the Double Jeopardy Clause. *Id.*

After examining *Various Items, Emerald Cut Stones,* and *89 Firearms,* the Supreme Court concluded that its cases concerning civil forfeitures under the Double Jeopardy Clause "adhere to a remarkably consistent theme"—"*in rem* civil forfeiture is a remedial civil sanction, distinct from potentially punitive *in personam* civil penalties such as fines, and does not constitute a punishment under the Double Jeopardy Clause." *Id.*

Most significantly, the Supreme Court rejected the view of the Sixth and Ninth Circuits that *Halper* and *Austin* abandoned this remarkably consistent theme.[8]  *Id.* at —— – ——, 116 S.Ct. at 2141–44. The Supreme Court exhaustively explained why these cases are distinguishable from and do not alter the holdings in the *Various Items, Emerald Cut Stones,* and *89 Firearms* line of cases. *Id.* at —— – ——, 116 S.Ct. at 2143–48. For purposes of this appeal, it is not necessary to restate the Supreme Court's comprehensive analysis of *Halper* and *Austin. Ursery* speaks for itself in this regard. Rather, we shall simply provide a broad summary of the Supreme Court's discussion of each case.

---

**8.** The Supreme Court also rejected the view that *Department of Revenue of Montana v. Kurth Ranch,* 511 U.S. 767, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994), represents a shift away from its remarkably consistent theme. In *Stratemeyer,* we, too, found *Kurth Ranch* to be "a fact-specific case with no precedential value on the facts now before us." 107 Md.App. at 436, 668 A.2d 948. Because this Court is in agreement with the Supreme Court in this regard, we shall not address *Ursery*'s discussion of the *Kurth Ranch* case.

According to the Supreme Court, *Halper* emphasized that its holding was limited to the context of civil penalties, as opposed to civil forfeitures. *Id.* at ——–——, 116 S.Ct. at 2143–44. In other words, the "narrow focus" in *Halper* followed from the historical distinction between civil penalties (in personam proceedings punitive in character) and civil forfeitures (in rem proceedings designed primarily for the nonpunitive purpose "to confiscate property used in violation of the law, and to require disgorgement of the fruits of illegal conduct"). *Id.* at ——–——, 116 S.Ct. at 2144–46. Thus, the Supreme Court stressed that civil forfeitures, in contrast to penalties, are designed to do more than compensate the Government. *Id.* As a result, while it may be possible to quantify the value of forfeited property, it is not possible to quantify the nonpunitive purposes served by the particular civil forfeiture. *Id.* Therefore, "[q]uite simply, the case-by-case balancing test set forth in *Halper*, in which a court must compare the harm suffered by the Government against the size of the penalty imposed, is inapplicable to civil forfeiture." *Id.*

The Supreme Court similarly distinguished *Austin*. The *Ursery* Court pointed out that *Austin* "did not involve the Double Jeopardy Clause at all"—but was decided solely under the Excessive Fines Clause of the Eighth Amendment. *Id.* at ——–——, 116 S.Ct. at 2146–48. Critically, the Supreme Court stated the Excessive Fines Clause has never been "understood as parallel to, or even related to," the Double Jeopardy Clause. *Id.* Moreover, the Supreme Court observed that in *Austin* it had expressly recognized and approved the decisions in *Emerald Cut Stones* and *89 Firearms*. *Id.* (citing *Austin*, 509 U.S. at 608 n. 4, 113 S.Ct. at 2805 n. 4).

Summarizing its view of *Halper* and *Austin*, the Supreme Court stated:

In sum, nothing in *Halper* ... or *Austin*, purported to replace our traditional understanding that civil forfeiture does not constitute punishment for the purpose of the Double Jeopardy Clause. Congress long has authorized the Government to bring parallel criminal proceedings and civil

forfeiture proceedings, and this Court consistently has found civil forfeitures not to constitute punishment under the Double Jeopardy Clause. It would have been quite remarkable for this Court both to have held unconstitutional a well-established practice, and to have overruled a long line of precedent, without having even suggested that it was doing so. *Halper* dealt with *in personam* civil penalties under the Double Jeopardy Clause ... and *Austin* with civil forfeitures under the Excessive Fines Clause. None of those cases dealt with the subject of this case: *in rem* civil forfeitures for purposes of the Double Jeopardy Clause.

*Id.*

With the "remarkably consistent theme" of the *Various Items, Emerald Cut Stones,* and *89 Firearms* line of cases presented and with *Halper* and *Austin* distinguished, the Supreme Court turned to consider whether the forfeitures involved in the *Ursery* consolidated cases violated the Double Jeopardy Clause. In so doing, the Supreme Court employed the "useful analytical tool" of the two-part test applied in *89 Firearms:* (1) whether Congress intended the forfeiture proceedings under 21 U.S.C. § 881(a)(6) and (a)(7) and 18 U.S.C. § 981(a)(1)(A) to be criminal or civil; and (2) whether the proceedings are so punitive in fact as to persuade the Court that they may not legitimately be regarded as civil, despite Congress's intent. *Id.*

With respect to the first part of the analysis, the Supreme Court concluded that "[t]here is little doubt that Congress intended these forfeitures to be civil proceedings." *Id.* As proof of this intention, the Supreme Court cited a number of factors, including: the statutory title of the forfeiture provisions ("Civil forfeiture"), the fact that these proceedings are impersonal *in rem* actions targeting the property itself, in contrast to the *in personam* nature of criminal actions, and the fact that the burden of proof shifts to the claimant once the government has shown probable cause that the property is subject to forfeiture. *Id.*

With regard to the second stage of the *89 Firearms* analytical framework, the Supreme Court found that "there is little evidence, much less the 'clearest proof' that we require, suggesting that forfeiture proceedings under [both federal provisions] are so punitive in form and effect as to render them criminal despite Congress' intent to the contrary." *Id.* at ——, 116 S.Ct. at 2148 (citations omitted). Indeed, the Supreme Court stated that the forfeiture provisions involved in the *Ursery* consolidated cases are essentially indistinguishable from those reviewed and held not to be punitive in *Various Items, Emerald Cut Stones,* and *89 Firearms. Id.*

Acknowledging that § 881(a)(6) and (a)(7), and § 981(a)(1)(A) have certain punitive aspects, the Supreme Court observed that the provisions "serve important nonpunitive goals." *Id.* Noting that § 881(a)(7) requires the forfeiture of all real property used or intended to be used to commit or to facilitate the commission of a federal drug felony, the Supreme Court determined that this section "encourages property owners to take care in managing their property and ensures that they will not permit that property to be used for illegal purposes." *Id.* (citations omitted). Similarly, the Supreme Court observed that § 981(a)(1)(A) provides for the forfeiture of property involved in illegal money-laundering transactions and that § 881(a)(6) requires the forfeiture of all things of value furnished or intended to be furnished in exchange for illegal drugs and all proceeds traceable to such an exchange. According to the Court, the same remedial purposes are served under these provisions. *Id.* Furthermore, to the extent that § 881(a)(6) applies to proceeds of illegal drug transactions, the "additional nonpunitive goal of ensuring that persons do not profit from their illegal acts" is served.

The Supreme Court concluded its discussion of the second part of the *89 Firearms* analysis, stating:

First, in light of our decisions in *Various Items, Emerald Cut Stones,* and *89 Firearms,* and the long tradition of federal statutes providing for a forfeiture proceeding following a criminal prosecution, it is absolutely clear that *in rem*

civil forfeiture has not historically been regarded as punishment, as we have understood that term under the Double Jeopardy Clause. Second, there is no requirement in the statutes that we currently review that the Government demonstrate *scienter* in order to establish that the property is subject to forfeiture; indeed, the property may be subject to forfeiture even if no party files a claim to it and the Government never shows any connection between the property and a particular person. Though both § 881(a) and § 981(a) contain an "innocent owner" exception, we do not think that such a provision, without more indication of an intent to punish, is relevant to the question whether a statute is punitive under the Double Jeopardy Clause. Third, though both statutes may fairly be said to serve the purposes of deterrence, we long have held that this purpose may serve civil as well as criminal goals. . . . Finally, though both statutes are tied to criminal activity, as was the case in *89 Firearms*, this fact is insufficient to render the statutes punitive. It is well settled that "Congress may impose both a criminal and a civil sanction in respect to the same act or omission." By itself, the fact that a forfeiture statute has some connection to a criminal violation is far from the "clearest proof" necessary to show that a proceeding is criminal.

*Id.*

In light of the result of the *89 Firearms* analysis, the Supreme Court concluded that the *in rem* forfeitures are neither punishment nor criminal for double jeopardy purposes. *Id.* Accordingly, the Supreme Court reversed the judgments of the Court of Appeals for the Sixth Circuit and the Court of Appeals for the Ninth Circuit. *Id.*

Our reading of *Ursery* leads to the inevitable conclusion that much of what we said and relied upon in *Stratemeyer* is incorrect. Although *Stratemeyer*'s ultimate holding (that no double jeopardy violation was present) is consistent with *Ursery*'s ultimate holding, in hindsight we now see that *Stratemeyer*'s underlying analysis was wrong in several respects.

Preliminarily, we were wrong to rely on *Halper, Austin,* and *Aravanis* for the proposition that a civil forfeiture is a punishment within the contemplation of the double jeopardy principles. *Ursery* conclusively dispelled that notion, holding that *Halper* and *Austin* do not affect the issue at hand. In particular, because the Supreme Court in *Ursery* determined that *Austin*'s excessive fines analysis was inapplicable to the issue and because the excessive fines provision of Article 25 of the Maryland Declaration of Rights is in *para materia* with the federal counterpart, we should not have viewed *Aravanis* as supporting the proposition that a civil forfeiture is punishment under double jeopardy principles. Moreover, we now see that in *Stratemeyer* we failed to give due regard to the "remarkably consistent theme" found in the *Various Items, Emerald Cut Stones,* and *89 Firearms* line of cases—namely, that *in rem* civil forfeitures are remedial civil sanctions, distinct from potentially punitive *in personam* civil penalties such as fines, and do not constitute punishment under the Double Jeopardy Clause. Finally, *Ursery* reversed the Sixth Circuit's decision—the three-part analysis in which we so heavily relied upon in *Stratemeyer.*[9]

Thus, as a result of the Supreme Court's decision in *Ursery,* we are required to abandon the analytical framework set forth in *Stratemeyer.*[10] In its place, the Supreme Court has made

---

**9.** In footnote 1 of the *Ursery* opinion, the Supreme Court stated that, because the civil forfeitures were not punishments under the Double Jeopardy Clause, it would not address whether the civil forfeiture was the same offense as the criminal prosecution and whether a civil forfeiture action that is parallel and contemporaneous with a criminal prosecution should be deemed to constitute a single proceeding within the meaning of the Double Jeopardy Clause. *Ursery,* —— U.S. at —— n. 1, 116 S.Ct. at 2140 n. 1.

**10.** In our very recent decision in *One 1984 Ford Truck VIN # 1FTCF15F1ENA87898 v. Baltimore County,* 111 Md.App. 194, 681 A.2d 527 (1996), we also recognized that *Ursery* invalidates *Stratemeyer.* The double jeopardy issue in the instant case is essentially the same as the double jeopardy issue disposed of in *One 1984 Ford Truck,* and our discussion of the double jeopardy issue herein essentially follows the same analytical framework and reaches the same conclusions as contained in *One 1984 Ford Truck.* The instant case, however, also

clear that the *89 Firearms* two-part approach is the appropriate "analytical tool" for resolving whether appellant's double jeopardy rights were violated in light of the fact that he was subjected to a criminal prosecution (resulting in a criminal punishment) and his property subjected to a civil forfeiture action (resulting in an order of forfeiture). That two-part approach, as we have explained, requires us to answer whether the Maryland Legislature intended the forfeiture proceedings under § 297 to be criminal or civil, and whether those proceedings are so punitive in fact as to persuade us that they may not legitimately be regarded as civil, despite the Legislature's intent.

With regard to the first step of the analysis, we hold that the Maryland Legislature intended the forfeiture proceedings under § 297 to be civil. This we recognized in *Stratemeyer,* wherein we stated that "[p]roceedings to forfeit property under these provisions of State or Federal law are regarded as civil proceedings *in rem." Stratemeyer,* 107 Md.App. at 427, 668 A.2d 948. *See also 1986 Mercedes Benz 560 CE VIN: WDBCA45DGA211147 v. State,* 334 Md. 264, 273, 638 A.2d 1164 (1994) ("A forfeiture proceeding is a civil action *in rem."); Prince George's County v. Blue Bird Cab Co.,* 263 Md. 655, 659, 284 A.2d 203 (1971) (same). In addition, as the Supreme Court recognized, at common law such proceedings were historically regarded as civil in nature. Moreover, *Ursery*'s conclusion that Congress intended the federal forfeiture proceedings to be civil is highly persuasive support for our belief that the Maryland Legislature intended forfeiture proceedings under § 297 to be civil. After all, our State forfeiture provisions "mirror, and were largely adopted from, a comparable Federal forfeiture law, 21 U.S.C. § 881(a)(4) and (a)(6)." *Stratemeyer,* 107 Md.App. at 427, 668 A.2d 948. *See also Aravanis,* 339 Md. at 655, 664 A.2d 888 (the construction of the federal forfeiture statute is persuasive as to the meaning of the Maryland forfeiture statute). Thus, our response to the

---

considers the proper standard of appellate review pursuant to the Supreme Court's decision in *Ornelas.*

first part of the *89 Firearms* test is identical to the response of the Supreme Court in *Ursery.*

Likewise, with respect to the second prong of the analysis, our result is identical to the result reached by the Supreme Court. Preliminarily, we have no doubt that civil forfeiture proceedings serve punitive purposes. Relying on *Austin* and *Aravanis,* we recognized as much in *Stratemeyer. Id.* at 436, 668 A.2d 948. So, too, did the Supreme Court in *Ursery* with respect to the federal forfeiture statute. *Ursery,* —— U.S. at —— —— ——, 116 S.Ct. at 2148–49. As the Supreme Court explained, and as we now recognize, forfeitures are subject to review for excessiveness under the Eighth Amendment after *Austin* (and under Article 25 of the Maryland Declaration of Rights after *Aravanis* ); "this does not mean, however, that those forfeitures are so punitive as to constitute punishment for the purposes of double jeopardy." *Id.* at —— —— ——, 116 S.Ct. at 2146–48. Thus, just as the Supreme Court limited *Austin* to the Excessive Fines Clause and declined to import *Austin* 's analysis into double jeopardy jurisprudence, *id.,* we now recognize that *Stratemeyer* should not have relied upon the analysis of *Aravanis.* In other words, because analysis of whether a fine is excessive under Maryland law is the same as under the Eighth Amendment of the U.S. Constitution, we see—with the benefit of 20/20 hindsight—that *Aravanis* is limited to excessive fine principles.

Although we recognize the punitive aspects of § 297, we are persuaded by *Ursery* 's construction of the federal forfeiture provision to conclude—as did *Ursery* with respect to the federal counterpart—that § 297 forfeiture proceedings are not so punitive as to persuade us that they may not legitimately be regarded as civil, despite the Legislature's intent. We reiterate that our forfeiture provisions mirror and were largely adopted from the federal forfeiture provisions and that, therefore, the construction of the federal forfeiture statute is most persuasive as to the meaning of the Maryland counterpart. Indeed, the textual provisions contained in Maryland's forfeiture statute are essentially identical to those contained in the federal statute, which, according to the Supreme Court,

indicate that the forfeitures were not so punitive as to constitute punishment for the purposes of double jeopardy. Consequently, we find that our State forfeiture provision serves the same nonpunitive goals as those served by the federal forfeiture provisions, as the Supreme Court in *Ursery* explained.

In light of the outcome of our application of the *89 Firearms* two-prong approach to the facts and circumstances of the instant case, we reject appellant's double jeopardy challenge. Accordingly, we affirm the circuit court's refusal to set aside appellant's criminal conviction and its refusal to dismiss the charges against appellant.

**JUDGMENT OF THE CIRCUIT COURT FOR KENT COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**